**Opinion issued December 6, 2012**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00610-CV

———————————

## IN THE INTEREST OF S.B.B., A CHILD

---

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-10761**

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, C.B., Jr., challenges the trial court's

order, entered after a bench trial, terminating his parental rights to his minor child.

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a) (West Supp. 2012).

In two issues, appellant[2] contends that the trial court erred in allowing his counsel to withdraw "on the day of trial" and the evidence is legally and factually insufficient to support the trial court's findings that he "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child"[3] and engaged in

---

[2] Although C.B., Sr. and G.B., the grandparents of the child, have filed a notice of appeal from the trial court's order, their appellate counsel has filed an appellants' brief on their behalf that contains only the following, single paragraph:

> Come now [the grandparents], appellants herein, and pursuant to TRAP 9.7, they adopt by reference and incorporate as if fully set forth herein the Appellant's Opening Brief filed by Appellant [the father].

The grandparents provide no separate argument regarding the provisions in the trial court's order denying them the relief that they requested in the proceedings below and terminating their rights as possessory conservators of the child. As illustrated above, the arguments set forth in the father's brief do not apply to the grandparents. For example, the grandparents provide no argument as to how the trial court's ruling allowing the father's counsel to withdraw on the day of trial affected their legal rights. The record reflects that the grandparents were represented by counsel in the proceedings below and they have not presented a separate complaint about their representation. Also, the grandparents have not asserted a separate complaint concerning the sufficiency of the evidence to support the trial court's findings related to them and terminating their legal rights as possessory conservators. Accordingly, we conclude that the grandparents have not presented anything separate for review from the matters presented in the father's brief and have waived any complaint about the trial court's judgment. *See* TEX. R. APP. P. 38.1(i).

[3] *See* TEX. FAM. CODE ANN. § 161.001(1)(D) (West Supp. 2011).

conduct or knowingly placed the child with others who engaged in conduct that endangered the child's physical or emotional well-being.[4]

We affirm.

## Background

C.B., Sr. and G.B., the grandparents of appellant's child had been appointed as the child's possessory conservators before the underlying bench trial. Prior to trial, appellant and the grandparents filed a Motion for Temporary Orders, Motion for Judge to Confer with Child, and Motion for Enforcement of Possession or Access, in which they asked the trial court to grant them additional visitation with the child because the child's mother, J.P., had refused to honor court-ordered visitation periods. They further requested that the trial court order the child be evaluated by a child psychiatrist or psychologist, "confer" with the child to determine his "wishes," and hold the mother in contempt.

The trial court entered temporary orders, stating that appellant and the grandparents were entitled to possession of and access to the child according to the terms set out in its prior orders. The trial court also appointed an amicus attorney to protect the best interest of the child, and it ordered that all parties "ensure" that the child's cousin who was fourteen-years old at the time of trial, have "no contact in any form" with the child.

---

[4] *See id*. § 161.001(1)(E).

3

The grandparents subsequently filed another Motion for Temporary Orders, requesting that "the visitation and possession provisions" in an April 2009 order "resume immediately based on the 'ruling out' status of the CPS [Children Protective Services] case" involving the child's cousin.[5] The grandparents also requested "standard" and "make up visitation" with the child and an evaluation of the child's "existing medical conditions." On this same day, the grandparents filed a Motion for Enforcement of Possession or Access stating that the child's mother had refused to abide by court orders granting them visitation with the child.

Appellant and the grandparents then filed a Second Amended Counter-petition to Modify Parent-Child Relationship, in which they sought an order appointing appellant as "joint managing conservator[]," awarding him additional possession, appointing the grandparents as joint managing conservators, and denying the mother access to the child.

Subsequently, the mother filed a Third Amended Petition to Modify Parent Child Relationship, Original Petition to Terminate Parent-Child Relationship, and Motion to Modify Temporary Orders. In this petition, the mother requested that the trial court remove the grandparents as possessory conservators and terminate

---

[5] Testimony during the bench trial reveals that appellant and the grandparents filed this motion after the Texas Department of Family and Protective Services ("DFPS") had "ruled out" as "unfounded" a sexual abuse allegation involving the child's cousin.

their access to the child and terminate appellant's parental rights. In support of her request to terminate the father's parental rights, the mother alleged that on November 17, 2010, the father had been arrested for narcotics-related felony offenses while on parole for convictions of prior felony offenses.

Mark Cargill, counsel for appellant and the grandparents, then filed a motion to withdraw as counsel for appellant, stating that any appearance he had made on behalf of appellant had been made as a "misunderstanding," appellant had "represented himself pro se in several prior hearings," and the trial court had previously recognized that appellant represented himself. Cargill further stated that the only remaining setting in the case was a "final hearing" set on April 20, 2011, a copy of the motion had been sent to appellant at the Anderson County Jail, and appellant had been notified "of the right to object to [the] motion."

On June 9, 2011, the trial court conducted a bench trial. At the beginning of the trial, the trial court took judicial notice of two of its prior orders: a May 14, 2009 order[6] entered after a jury trial and a May 14, 2010 temporary order. The amicus attorney for the child then asked the trial court to clarify who Mark Cargill represented. Cargill responded that he represented only the grandparents, and his representation of appellant ceased when the mother sought termination of his

---

[6] The parties do not direct us to a May 14, 2009 order in the record before us, nor is there any transcript in the record from a previously conducted jury trial. Based upon the parties' briefing, it appears that the prior jury trial related to conservatorship of the child.

parental rights. Appellant confirmed on the record that he understood this fact and did not object to Cargill's withdrawing from representing him.

The mother testified that on February 25, 2009, she became concerned about the child's well-being when he made an "outcry" regarding a sexual abuse allegation involving the child's cousin, who, at various points in his life, had lived with the grandparents. Prior to this "outcry," the mother had noticed that the child was "severely withdrawn" and "starting to show anger in school." She also noticed that when she would take the child to visits with the grandparents, he withdrew and "didn't want to go," would "ball up in a fetal position," and was in "pain." When the child returned from his visits with the grandparents, he was "a little withdrawn" and "very tired."

The mother asked the trial court to terminate the father's parental rights and the grandparents' rights as possessory conservators for the benefit the child's emotional and physical well-being and "safety" and so he could be "normal." She stated that the grandparents were currently seeing the child "every other weekend" and it was "very inappropriate" for them to "have basically parental rights of visitation."

The mother explained that appellant had been living with the grandparents prior to his recent arrest for a "parole violation on manufacturing a controlled substance with intent to deliver." And she introduced into evidence a copy of a

judgment of conviction, dated August 17, 2006, reflecting that appellant had been convicted of the first degree felony offense of possession of a "certain chemical" with intent to manufacture and sentenced to confinement for 15 years. The mother noted that if appellant "serve[d] his entire term" he would be "unable to provide care or assistance" to the child. She further explained that appellant had been incarcerated since November 17, 2010, on a parole violation and he, thus, had not be able to visit with the child since that time. The mother believed it was in the child's best interest to terminate appellant's parental rights, and she stated, in response to a question from her counsel, that she did not want the child to be around the "manufacture of methamphetamine." She also claimed that appellant had "show[n] a violent nature . . . towards [her]."

The mother noted that the trial court had previously entered temporary orders allowing the grandparents to visit the child in Harris or Montgomery Counties and prohibiting the parties from allowing the child to have contact with his cousin. Although she opined that it was not in the child's best interest to have to travel to visit the grandparents, she agreed that she has another minor child who resides in Huntsville, Texas, with whom she has "standard visitation" rights. Other evidence indicated that the mother had exchanged possession of her other minor child in another location that was in general proximity to the location where the parties in the instant case had exchanged possession of the child.

7

Also, the mother agreed that, despite her complaints that the child was "slipping academically" and "bringing home a lot of F papers," the child's most recent report card contained five B's and two A's. She also agreed that, contrary to her prior testimony that the child's conduct in school had been "deteriorating," the child had actually received an A in conduct for the 2011 school year. The mother further agreed that the grandparents had had "significant contact" with the child during his life. And she conceded that the child loves his paternal grandparents and appellant. The mother also acknowledged that although appellant had "[t]hirteen years left on his parole," she did not know "whether []  he'll be violated on his parole."

The mother further testified that the child was in counseling, but she would not disclose to appellant and the grandparents the name of the counselor.[7]  In regard to the sexual abuse allegation, she testified that it was her "understanding" that the child had "alleg[ed]" that the cousin would "sneak" into the child's bed at night. The mother also "believ[ed]" that G.B. had been "aware" of this allegation, but "not a thing was done." However, the mother agreed that CPS had conducted

---

[7]    The child's counsel and the amicus attorney asserted that the identity of the child's counselor was "privileged." The trial court agreed, and it precluded appellant and the grandparents from inquiring about the identity of the counselor or related matters.

8

an investigation, interviewed the child, and determined that the allegation was "unfounded."

The mother asserted that the child, contrary to court orders, had had unsupervised visitation with appellant and "telephone contact" with the cousin, and she had a "major concern" regarding the child's "safety." She also opined that the grandparents had talked to the child about the litigation.

Appellant testified that in 2006 a court sentenced him to confinement for 15 years on a narcotics conviction, but he was subsequently granted parole. He explained that in 2010 he had been arrested for and charged with the felony offense of possession of methamphetamine of more than 4 grams but less than 200 grams. Appellant denied that his parole had been revoked at the time of the trial, noting that he was incarcerated on a "blue warrant." He emphasized that he had not gone to trial or been "found guilty" of the 2010 methamphetamine offense, and he denied possessing the methamphetamine. However, appellant agreed that it was not in the child's best interest to be around a person who manufactures and delivers methamphetamine. He also agreed that, in light of the 2010 offense, he was presently incarcerated and unable to attend to the child. However, appellant noted that he had a "court date" the following Monday for a pretrial setting, and he believed that the "issue" would be "taken care of."

Appellant explained that he was receiving supplemental social security income for disability and had been paying child support. He noted that the child and the cousin are "like brothers" and grew up with each other. Appellant stated that, to his knowledge, when the child and his cousin stayed at the grandparents' house, they slept in different rooms. Appellant noted that the child never approached him about concerns about the cousin, and he did not believe the sexual abuse allegation. And all parties had stipulated that CPS had conducted an investigation into the sexual abuse allegation involving the cousin and CPS had "ruled it out." The parties also stipulated to the admission of a report prepared by the Texas Department of Family and Protective Services ("DFPS"), which reflected that the sexual abuse allegation involving the cousin had been "ruled out."

Appellant further testified that, prior to his incarceration, he visited the child at the grandparents' house because he was ordered to have supervised visits. And he denied having unsupervised visits with the child. Appellant noted that the grandparents have a "very good relationship" with the child, the child was always very excited to visit with his grandparents, and he did not want to return to the mother at the end of his visits with his grandparents. Appellant opined that the mother did not care for the child medically or "interact" with the child.

Lynn Badger, a licensed counselor and former CPS investigator, testified that she counseled the child's cousin in April 2010. After interviewing the cousin on three occasions, Badger determined that the sexual abuse allegation was "unfounded." She also stated that the two boys had a "very loving relationship" as cousins, the grandmother had a "very caring" relationship with the child, and the grandparents were "very involved" with the child.

G.B. testified that she and her husband, at the time of trial, had been possessory conservators of the child since 2004. Prior to that, the child had lived in their home for one and one-half of a year. Since May 2009, the grandparents had visited the child whenever allowed, but the mother had denied their visitation rights on 28 different days. G.B. described their visits with the child as "wonderful," and she noted that the child always told her that he wanted to live with them. G.B. complained that the mother had not reported taking the child to a physician for his "major" medical issue. G.B. noted that, if allowed, she would take the child to a physician to treat this medical issue. G.B. also stated that she thinks that the child needs psychotherapy. And she noted that, when the child arrives for his visits, he is always excited; when he returns to the mother, he cries.

G.B. explained that she did not believe the allegation made against the child's cousin, and the child told her that the cousin never behaved inappropriately with him. The cousin and the child slept in different rooms, and she never saw the

11

cousin act inappropriately with the child. If G.B. had witnessed the cousin behave inappropriately, she would have reprimanded him and "[t]aken him in." She noted that the cousin and the child are "like brothers." Although G.B. did allow a telephone conversation between the cousin and the child on two occasions, the contact occurred only after CPS had ruled out the sexual abuse allegation. And although she did not believe that she was in violation of a court order, once notified that her conduct constituted a violation, she did not repeat it.

C.B., Sr. testified that appellant and the child lived on a piece of property near his home in 2000. But he explained that he could not see what went on at appellant's home. C.B., Sr. explained that he had never left the child alone with appellant during the child's visits. He noted that the child and the cousin were like brothers, and he stated that the child would become upset when he was not allowed to "see anybody else during the visitations." The child also became upset when he had to return to the mother following visits with his grandparents.

C.B., Sr. noted that the child never made any outcries of sexual abuse. If he had, the grandparents would have separated the children, and they would have sought help. C.B., Sr. noted that his family had allowed CPS into their home after the allegation, CPS had thoroughly conducted an investigation and talked with everybody, and it ruled out the allegation. He opined that it was in the child's best interest to maintain contact with him and his wife. And C.B., Sr. agreed that he

12

and his wife, pursuant to appellant's instructions, had taken the child to a therapist.[8]

Following the trial, the court entered an "Order of Termination, Order in Suit to Modify the Parent-Child Relationship, and Order Denying Motions for Enforcement." In its order, the trial court noted that appellant had appeared at the trial pro se and he and Cargill had agreed in open court that Cargill did not represent appellant. The trial court denied appellant's Motion for Enforcement and the grandparents' Second Amended Counter-petition to Modify Parent-Child Relationship and Motion for Enforcement. The trial court found true the "material allegations" in the mother's Third Amended Motion to Modify Parent Child Relationship and Original Petition to Terminate and that granting the relief requested therein was in the child's best interest. The trial court also found that appellant had knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered his physical or emotional well-being[9] and engaged in conduct or knowingly placed the child with others who engaged in conduct that endangered his physical or emotional well-being.[10] And

---

[8]    There was testimony and argument that doing this was in violation of prior court orders.

[9]    *See* TEX. FAM. CODE ANN. § 161.001(1)(D).

[10]   *See id.* § 161.001(1)(E).

13

the trial court further found that termination of appellant's parental rights was in the child's best interest. Accordingly, the trial court terminated appellant's parental rights.

In a section of the order entitled Termination of Possession of and Access to the Child by the Paternal Grandparents, the trial court found that the grandparents had knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child[11] and engaged in conduct or knowingly placed the child with others who engaged in conduct that endangered the physical or emotional well-being of the child.[12] The trial court further found that termination of the grandparents' possession of and access to the child was in the child's best interest. Accordingly, the trial court terminated all prior orders of possession and access in favor of the grandparents and removed them as possessory conservators.

## Sufficiency of the Evidence

In his second issue, appellant argues that the evidence is legally and factually insufficient[13] to support the termination of his parental rights pursuant to

---

[11]     *See id.* § 161.001(1)(D).

[12]     *See id.* § 161.001(1)(E).

[13]     Because appellant, in his brief, cites the standard of review for factual sufficiency, we will construe his brief to include a factual-sufficiency complaint. However, we

14

subsections (D) and (E) of Texas Family Code section 161.001(1) because the sexual abuse allegation involving the child's cousin was ruled out and appellant had "no part in any alleged violation of any temporary [court] order" by allowing the child to have telephone contact with the cousin. *See* TEX. FAM. CODE ANN. §161.001 (1)(D), (E). Appellant notes that, at the time of the alleged violation of the trial court's temporary orders, he was incarcerated.

A parent's right to "the companionship, care, custody, and management" of his child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal citation omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has also concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, No. 11-0713, 2012 WL 4840710, at *4 (Tex. Oct. 12, 2012).

---

note that he does not distinguish between his legal- and factual- sufficiency arguments.

15

Because termination of parental rights "is complete, final, irrevocable, and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20 (citing *Santosky*, 455 U.S. 747-48, 102 S. Ct. at 1391-92)); *Richardson v. Green*, 677 S.W.2d 497, 500 (Tex. 1984)). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 256, 264–66.

In conducting a legal-sufficiency review in a parental-rights termination case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *See id*. at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so," and we "should disregard all evidence that a reasonable fact finder could have disbelieved or found to be

16

incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d at 266).

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which the State bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In order to terminate the parent-child relationship under section 161.001, a party must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs.*

*v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Under section 161.001(1)(E), a court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN . § 161.001(1)(E). "Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533. Although such endangerment requires more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

Texas courts have recognized that criminal activity that exposes a parent to incarceration may be relevant to establish conduct that endangers the emotional and physical well-being of a child. *See Boyd*, 727 S.W.2d at 533 ("[I]mprisonment

18

is certainly a factor to be considered by the trial court on the issue of endangerment."); *Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (evidence of father's commission of numerous robberies was relevant). However, the Texas Supreme Court has also emphasized that "[m]ere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." *Boyd*, 727 S.W.2d at 533–34. "[I]f the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding" of endangerment under section 160.001(1)(E) is supportable. *Id.* However, the termination of parental rights should not be used as punishment in addition to imprisonment for the commission of criminal offenses. *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

The record before us contains the August 17, 2006 judgment reflecting that appellant had been convicted of the first degree felony offense of possession of a "certain chemical" with intent to manufacture and sentenced to confinement for 15 years. In subsequent testimony, appellant acknowledged that this 2006 conviction related to the possession of chemicals with the intent to manufacture methamphetamine. Records in evidence indicate that the child was approximately three to four years of age at the time of appellant's 2006 conviction. And appellant

19

agreed that he had been incarcerated for this offense for a period of time, but he was subsequently granted parole. The evidence also demonstrates that appellant was arrested for the 2006 offense at his home, which was located approximately 300 yards across a pasture from his parents' home.

Appellant also acknowledged that in 2010 he was arrested at his parents' home for the offense of possession of methamphetamine. Although he, at trial, denied actually possessing methamphetamine, and he noted that he had not yet been found guilty of the offense, he acknowledged that he was currently incarcerated on a "blue warrant," a parole revocation warrant on which a person is held incarcerated pending a parole revocation hearing. And appellant agreed that it was not in the child's best interest to "be around a person who manufactures and delivers methamphetamine."

In her testimony, the mother explained that appellant had been incarcerated "since" November 17, 2010, the date of his most recent arrest for possession of methamphetamine. At the time of his 2010 arrest, the child was eight years old. The bench trial in the underlying termination proceedings took place on June 9, 2011, indicating that appellant had been incarcerated as a result of his most recent arrest for possession of methamphetamine and parole violation for approximately six months. The mother explained that she would "absolutely not" want the child associated with or "around in any way" the "occupation" of the "manufacture of

20

methamphetamine." And the mother did not believe it was in the child's best interest for appellant to retain parental rights.

On appeal, appellant does not at all address the fact that the mother, in large part, sought termination of his parental rights based upon his history of conduct in manufacturing and possessing methamphetamine. In his appellate briefing, appellant does not in any way address the documentary evidence and testimony concerning his 2006 conviction and confinement for the felony methamphetamine offense, his 2010 arrest for a new felony methamphetamine offense, and his subsequent confinement. There is simply no discussion at all of whether the force and effect of this evidence could have created in the fact finder a firm conviction or belief that appellant had been engaged in a course of endangering conduct. Rather, the sole focus of appellant's briefing to this Court concerns the ruled-out sexual abuse allegations involving the child's cousin and the related allegations of neglectful supervision.[14] In sum, in conducting our legal-sufficiency review, we cannot disregard the fact that appellant himself has made no serious effort to challenge the sufficiency of the evidence concerning his conviction and subsequent

---

[14] Appellant's only reference to his incarceration in the substantive portion of his appellate brief is his assertion that he was incarcerated at the time of trial and, thus, could have had no involvement in any alleged violation of court orders by permitting contact between the child and his cousin. He has simply not provided this Court with any argument pertaining to the mother's arguments that his felony narcotics conviction and subsequent arrest, and the periods of confinement associated with each event, serve as a basis for terminating his parental rights.

arrest for separate felony methamphetamine-related offenses and the mother's testimonial assertion that appellant had been involved in the manufacture of methamphetamine.

Based upon the evidence that appellant had been incarcerated for at least two significant periods of time during the child's life (the first arising from his 2006 felony conviction and the second from his 2010 felony arrest and "blue warrant" while on parole), as well as the mother's testimonial assertion that appellant was involved in the manufacture of methamphetamine, the trial court, acting as fact finder, could have reasonably found that appellant had engaged in conduct that endangered the physical or emotional well-being of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(E). Although appellant presented conflicting evidence, and although he denied that he possessed methamphetamine related to his 2010 felony arrest, the trial court was not required to believe his testimony. Crediting the documentary evidence and the supporting testimony, the trial could have found that the child's physical and emotional well-being were endangered by the father's ongoing conduct and that the father's parental rights should be terminated. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient for a reasonable fact finder to form a "firm belief or conviction" that appellant engaged in conduct that endangered the physical or emotional well-being of the child and the trial court did not err in terminating appellant's parental rights

pursuant to section 161.001(1)(E).  Having held that the evidence is legally and factually sufficient to support a finding of termination under section 161.001(E), we need not consider the father's challenges to the sufficiency of the evidence to support a finding of termination under section 161.001(D).[15]  *See In re A.V.*, 113 S.W.3d at 362.

We overrule appellant's second issue.

### Withdrawal of Counsel

In his first issue, appellant argues that the trial court erred in allowing his counsel to withdraw "on the day of trial" because the withdrawal "wholly failed to comply" with the pertinent rules.  The mother responds that appellant consented to his counsel's withdrawal, appellant fully participated in the trial, and appellant never requested a continuance or asserted that he was prejudiced as a result of the withdrawal.

We review the granting of a motion to withdraw for an abuse of discretion. *Sims v. Fitzpatrick*, 288 S.W.3d 93, 100 (Tex. App.—Houston [1st Dist.] 2009, no pet.).  A court abuses its discretion when it grants a motion to withdraw that does not comply with the mandatory requirements of Texas Rule of Civil Procedure 10. However, any error in granting a motion to withdraw "may be harmless if the court

---

[15]     Additionally, we note that appellant did not challenge the trial court's finding that termination of his parental rights was in the best interest of the child.  *See* TEX. FAM. CODE ANN. § 161.002 (West Supp. 2012).

allows the party time to secure new counsel and time for the new counsel to investigate the case and prepare for trial." *Id*.

Rule 10 provides, in relevant part,

> An attorney may withdraw from representing a party only upon written motion for good cause shown. . . . . If another attorney is not to be substituted as attorney for the party, the motion shall state: that a copy of the motion has been delivered to the party; that the party has been notified in writing of his right to object to the motion; whether the party consents to the motion; the party's last known address and all pending settings and deadlines. If the motion is granted, the withdrawing attorney shall immediately notify the party in writing of any additional settings or deadlines of which the attorney has knowledge at the time of the withdrawal and has not already notified the party. . . . Notice or delivery to a party shall be either made to the party in person or mailed to the party's last known address by both certified and regular first class mail. . . .

TEX. R. CIV. P. 10.

Appellant complains that "no compliance" with this rule appears in the record. However, the clerk's record contains a copy of attorney Mark Cargill's withdrawal motion, which complies with the cited requirements. The motion stated that Cargill had delivered a copy of it to appellant at the Anderson County Jail, where he was incarcerated. The motion set forth the address of the jail, it informed appellant of his right to object, and it disclosed the remaining pending deadlines. Appellant does not complain on appeal that other deadlines were omitted in the motion to withdraw. Nor does he assert that any other alleged omission in the motion affected the trial proceedings.

24

Additionally, the reporter's record reflects that, at the beginning of the bench trial, appellant expressed no surprise that Cargill was no longer representing him. The record makes clear that appellant was aware that he was not being represented by counsel, and he made no request for substitution of counsel or the appointment of counsel. The parties specifically mentioned that Cargill had served upon appellant his motion to withdraw. Cargill further explained that he had, in fact, withdrawn from representing appellant once the mother sought to terminate appellant's parental rights. Cargill also explained that, at that point in the litigation, he only represented the grandparents. Following this discussion, the trial court asked appellant if he had any objection to Cargill's withdrawal, and appellant stated that he did not. Accordingly, we hold that the trial court did not err in allowing Mark Cargill to withdraw from representing appellant

We overrule appellant's first issue.[16]

---

[16] We note that appellant makes no argument that he was indigent or entitled to the appointment of counsel in the proceedings below. Thus, we do not consider these issues. Appellant also makes no argument that he did not receive any additional required warnings before consenting, on the record, to proceeding pro se. *See In re C.L.S.*, No. 01-11-00439-CV, 2012 WL 5360975 at *5 (Tex. App.–Houston [1st Dist.] Oct 31, 2012, no pet. h.) (holding that, "in parental termination cases, before a parent is permitted to represent himself pro se, the record should show that the trial judge has informed him that there are technical rules of evidence and procedure, and that he will not be given any special consideration simply because he has asserted his right of self-representation") (citations omitted). Rather, appellant's brief is confined to his assertion that his counsel's withdrawal was not done in accordance with the relevant rules.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.